1

2

3

4

5

6

7

8

9

10

**FILED**
CLERK, U.S. DISTRICT COURT

11/8/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>PAVEL HURTADO,<br> aka "Temper,"<br>ELI GRIJALVA,<br> aka "Skinny,"<br>HERLYN BARRIENTOS,<br> aka "Doctorazo,"<br>CESAR SARAVIA,<br> aka "Sleepy,"<br> aka "Washington,"<br>PEDRO VALLADARES,<br> aka "Psycho,"<br>ELMER LINARES,<br> aka "Macabro,"<br>ORLANDO OLIVAR-MARTINEZ,<br> aka "Tacuba,"<br>CARLOS TORRES-MIRANDA,<br> aka "Estricto,"<br> aka "Malaspecto,"<br>JUAN ARRONIZ,<br> aka "Tiny,"<br>EDER GOMEZ-MEJIA,<br> aka "Huero,"<br>CHRISTOPHER MARTIR,<br> aka "Insolente,"<br>AMILCAR GONZALEZ,<br> aka "Lunatico,"<br>AGUSTIN AQUINO-MARTINEZ,<br> aka "Chino,"<br><br>JOSE REYES, | CR No.   2:23-cr-00545-AB<br><br>I N D I C T M E N T<br><br>[21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute and to Distribute Methamphetamine; 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine; 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms and Ammunition; 21 U.S.C. § 853, 18 U.S.C. § 924(d)(1), and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

 aka "Husky,"
JOSE ARREDONDO,
 aka "Misterio,"
ANDERSON MENDOZA,
 aka "Cypher,"
CLIDER GODINEZ-CAMPOS,
 aka "Jicli,"
DOUGLAS TORRES,
 aka "Midnight,"
CHRISTOPHER JACO-VILLALOBOS,
 aka "Clavo,"
MARIA CHAVEZ,
 aka "Moana,"
MARCO HERNANDEZ,
 aka "Clandestino,"
RIQUELMY ABARCA,
 aka "Bago," and
BYRON CHINCHILLA,
 aka "Psycho,"

          Defendants.

The Grand Jury charges:

GENERAL ALLEGATIONS

At times relevant to this Indictment:

1.    Mara Salvatrucha was formed in Los Angeles, California in the mid-1980s by immigrants fleeing the civil war in El Salvador. Once in Los Angeles, they organized themselves into a group called Mara Salvatrucha, which was initially largely composed of Salvadoran immigrants.  "Mara" is a Central American term for gang.  "Salva" refers to El Salvador.  In the 1990s in Los Angeles, Mara Salvatrucha distinguished itself by committing brutal acts of violence against rival gang members and non-gang members.  In the mid-1990s, Mara Salvatrucha became associated with the Mexican Mafia, commonly referred to as "la Eme" (which translates in English to "the M"), and added the number "13" to its name.  The number "13" marks the 13th letter of the alphabet: "M."  Thus, Mara Salvatrucha became MS-13. While MS-13 originated in Los Angeles, over the years, MS-13 spread

as its members were deported to El Salvador and because its members traveled to other locations in the United States and abroad.  As a result, in addition to operating in Los Angeles, MS-13 operated nationally and internationally, with more than ten thousand members regularly conducting gang activities in at least ten states and Washington, D.C., and with thousands more conducting gang activities in Central America and Mexico.

2.   MS-13 in Los Angeles, and MS-13 nationally and internationally, was largely comprised of persons from Central America, including El Salvador, Honduras, and Guatemala.  Although each MS-13 locale had a common origin, MS-13 in Los Angeles operated differently in El Salvador, Honduras, Guatemala, and the other states within the United States.  Notwithstanding, clique names in other parts of the United States were named for existing cliques in Los Angeles.  At times, MS-13 members from other geographic locations traveled to Los Angeles to participate in leadership meetings; however, MS-13 in Los Angeles was independent and self-governing, and made its own decisions.  Conversely, MS-13 members in Los Angeles were sometimes called upon to provide input in other parts of the country.  Additionally, MS-13 members in Los Angeles trafficked narcotics from Los Angeles to other parts of the country.

3.   MS-13 operated through subsets known as "cliques," which were usually named for a street within a clique's territory, or for the neighborhood in which the clique operated.  MS-13 had approximately 20 cliques operating in Los Angeles, including, but not limited to, "Adams," "Centrales," "Coronados," "Francis," "Fulton," "Harvard," "Hollywood," "Leeward," "King Boulevard," "Molinos," "Normandie," "Parkview," "Southside," "Tiny Winos," "Travieso," and

1    "Vagos."  Each clique typically had one or more leader at any given
2    point, commonly referred to as "shot callers," who were responsible
3    for, among other things, managing the narcotics trafficking operation
4    in the clique's territory, collecting extortion payments, directing
5    the day-to-day management of the clique, enforcing MS-13's and the
6    Mexican Mafia's codes of conduct, resolving intra-clique disputes,
7    and representing their respective cliques at the MS-13 general
8    meetings.
9         4.   One distinguishing feature about MS-13 in Los Angeles was
10   that it was beholden to the Mexican Mafia, which was a criminal
11   organization that united Hispanic gang members under a single
12   alliance that operated within the California state prison system, the
13   federal prison system, the streets and suburbs of large cities
14   throughout Southern California, and elsewhere.  Members of the
15   Mexican Mafia, commonly referred to as a "Carnal," "Brother," "Big
16   Homie," "Tio" (Spanish for "uncle"), and/or "Padrino" (Spanish for
17   "godfather"), typically came from the ranks of local Southern
18   California Hispanic street gangs, including MS-13.  By controlling
19   the criminal activities occurring within prison facilities, providing
20   protection for imprisoned members and associates of Hispanic gangs,
21   and imposing discipline, often in the form of acts of violence,
22   against both individuals and street gangs who failed to adhere to its
23   directives, the Mexican Mafia rose to the position where it exercised
24   control over Hispanic street gangs operating throughout the State of
25   California.  Specifically, its individual members controlled one or
26   more Hispanic street gangs, which served as the power base through
27   which the Mexican Mafia members operated their individual criminal
28   enterprises.  In return for its integration into the Mexican Mafia,

4

1  MS-13 members received the Mexican Mafia's protection in the
2  neighborhoods and also in prison.
3      5.    Like all gangs associated with the Mexican Mafia in
4  California, MS-13 was required to pay a specified sum, commonly known
5  as "taxes" or "rent" on a regular basis to a member of the Mexican
6  Mafia.   In Los Angeles, each MS-13 clique or sub-set contributed a
7  portion of its profits, derived primarily from narcotics and drug
8  sales and extortion of street vendors, to the Mexican Mafia.   Each
9  member of an MS-13 clique, whether incarcerated or not, was expected
10 to contribute financially to their clique's rent payment.   In return
11 for the tax payments, the Mexican Mafia provided protection to all
12 MS-13 members incarcerated in county, state and federal prisons and
13 jails in California.   Additionally, and in exchange for the tax
14 payments, the Mexican Mafia allowed MS-13 to sell narcotics in its
15 territories.   Finally, the Mexican Mafia ensured that no other gang
16 operated in MS-13's territory or otherwise interfered with MS-13's
17 criminal activities.   Failure of MS-13 to pay its tax to the Mexican
18 Mafia would result in a "green light" on MS-13, that is, a general
19 order from the Mexican Mafia to assault or kill any incarcerated MS-
20 13 member in any facility controlled by the Mexican Mafia or outside
21 of prison facilities.   It was unlikely that MS-13 in Los Angeles
22 could continue to exist if it chose not to pay its taxes, tantamount
23 to extortion payments, to the Mexican Mafia.
24     6.    The Mexican Mafia invited some incarcerated MS-13 members
25 to join its leadership.   In this role, those MS-13 members who were
26 chosen to participate in managerial roles for the Mexican Mafia
27 completed various tasks, including, but not limited to, facilitating
28 the smuggling of narcotics into the prison facilities, carrying out

orders of discipline and/or determining who will carry out orders of discipline, representing the Mexican Mafia amongst other leaders of the prison/custodial facility, and ensuring that MS-13 members, and other Hispanic gang members under their control, followed the Mexican Mafia's code of conduct.  Additionally, incarcerated MS-13 members could still actively participate in MS-13's activities outside of prisons, including contributing rent money to their respective cliques, hearing disputes between MS-13 members and cliques, determining and/or agreeing or disagreeing with punishment, and ordering discipline for violating the Mexican Mafia's and MS-13's codes of conduct.  While incarcerated, MS-13 members followed the Mexican Mafia's code of conduct.

7.   MS-13's regular tax payments to the Mexican Mafia came from MS-13's cliques, who paid the tax on a monthly or yearly basis.  MS-13 cliques obtained their payments from their individual members. MS-13's clique leaders were involved in the coordination of tax collection throughout the territory MS-13 controlled in Los Angeles. Additionally, each clique leader was responsible for collecting extortion, in the form of gang "dues," from each clique member in order to pay each clique's allotted monthly or yearly extortion payment to the Mexican Mafia.  If a clique member did not pay his/her "dues" to the clique, the clique shot caller would "green light" the delinquent member and punishment would be meted out, usually by violence.

8.   In Los Angeles, MS-13 operated under the "Los Angeles Program," which was distinct from programs in El Salvador, Honduras, Guatemala, and other parts of the United States, whereby its leaders and members made all decisions concerning how and when a new person

6

became a member of MS-13, how MS-13 operated, when discipline was meted out, when a clique was responsible for paying its extortionate rent payments, the geographical boundaries of each clique, and the identity of the shot callers and leaders.

COUNT ONE

[21 U.S.C. § 846]

[DEFENDANTS HURTADO, GRIJALVA, BARRIENTOS, SARAVIA, VALLADARES, LINARES, OLIVAR-MARTINEZ, TORRES-MIRANDA, ARRONIZ, GOMEZ-MEJIA, MARTIR, GONZALEZ, AQUINO-MARTINEZ, REYES, ARREDONDO, MENDOZA, GODINEZ-CAMPOS, TORRES, JACO-VILLALOBOS, CHAVEZ, HERNANDEZ, ABARCA, and CHINCHILLA]

Paragraphs 1 through 8 of the General Allegations of this Indictment are re-alleged and incorporated here.

A.    OBJECTS OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury, and continuing to on or about November 8, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendants PAVEL HURTADO, also known as ("aka") "Temper," ELI GRIJALVA, aka "Skinny," HERLYN BARRIENTOS, aka "Doctorazo," CESAR SARAVIA, aka "Sleepy," aka "Washington," PEDRO VALLADARES, aka "Psycho," ELMER LINARES, aka "Macabro," ORLANDO OLIVAR-MARTINEZ, aka "Tacuba," CARLOS TORRES-MIRANDA, aka "Estricto," aka "Malaspecto," JUAN ARRONIZ, aka "Tiny," EDER GOMEZ-MEJIA, aka "Huero," CHRISTOPHER MARTIR, aka "Insolente," AMILCAR GONZALEZ, aka "Lunatico," AGUSTIN AQUINO-MARTINEZ, aka "Chino," JOSE REYES, aka "Husky," JOSE ARREDONDO, aka "Misterio," ANDERSON MENDOZA, aka "Cypher," CLIDER GODINEZ-CAMPOS, aka "Jicli," DOUGLAS TORRES, aka "Midnight," CHRISTOPHER JACO-VILLALOBOS, aka "Clavo," MARIA CHAVEZ, aka "Moana," MARCO HERNANDEZ, aka "Clandestino," RIQUELMY ABARCA, aka "Bago," and BYRON CHINCHILLA, aka "Psycho," and others known and unknown to the Grand Jury, conspired with each other to knowingly and intentionally possess with intent to distribute, and distribute, at least 50 grams of methamphetamine, a

1  Schedule II controlled substance, in violation of Title 21, United

2  States Code, Sections 841(a)(1), (b)(1)(A)(viii).

3  B.  <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE</u>

4  <u>ACCOMPLISHED</u>

5  The objects of the conspiracy were to be accomplished, in

6  substance, as follows:

7  1.  An incarcerated MS-13 member who was also a member of the

8  Mexican Mafia (the "MS-13 Inmate") would exercise control of MS-13

9  Los Angeles by imposing a rule on all MS-13 Los Angeles cliques that

10 required them to buy methamphetamine for re-distribution from

11 defendant BARRIENTOS, and others known and unknown to the Grand Jury,

12 with some profits from that distribution flowing to the MS-13 Inmate.

13 2.  The MS-13 Inmate would designate certain MS-13 members,

14 like defendants HURTADO and GRIJALVA, to be the overall shot caller

15 for MS-13 Los Angeles.  As the overall shot caller, defendants

16 HURTADO and GRIJALVA would oversee MS-13's drug trafficking

17 activities and communicate with the MS-13 Inmate to coordinate drug

18 trafficking activities for MS-13.

19 3.  MS-13 members would use violence and intimidation to

20 control narcotics trafficking in territories controlled by MS-13.

21 Narcotics sales would comprise the majority of revenue generated by

22 MS-13.  In order to sell narcotics within MS-13's territory, one

23 must either be an MS-13 member, an associate, or otherwise have

24 permission from, and pay extortionate rent payments to, MS-13.

25 4.  MS-13 shot callers, including defendants SARAVIA,

26 VALLADARES, LINARES, OLIVAR-MARTINEZ, TORRES-MIRANDA, ARRONIZ, GOMEZ-

27 MEJIA, and GONZALEZ, and others known and unknown to the Grand Jury,

28 would be responsible for the geographic territory under their

cliques' respective control.  Within a clique's geographic boundaries, that clique, as controlled by the shot caller, would have exclusive rights to distribute narcotics.  Additionally, shot callers would be responsible for collecting, from MS-13's general members, their clique's extortionate rent payments, the bulk of which would likely be comprised of narcotics profits and proceeds.

5.   Additionally, each clique member, including defendants REYES, ARREDONDO, MENDOZA, GODINEZ-CAMPOS, TORRES, JACO-VILLALOBOS, HERNANDEZ, ABARCA, and CHINCHILLA, and others known and unknown to the Grand Jury, would answer to the clique's respective shot caller and would be responsible for, among other things, protecting clique territory, marking or denoting clique territory by affixing graffiti to structures and public property located within clique territory, monitoring street corners for non-MS-13 member narcotics distributors, looking for ways to expand clique territory, and obtaining and maintaining firearms to aid in the protection of clique territory, all to ensure that his or her clique could exclusively distribute narcotics within clique territory.

6.   Each MS-13 member and associate, along with wholesale narcotics suppliers and street narcotics dealers, would receive authorization from the shot callers to traffic in controlled substances within individual clique territories, and in return, would be required to pay a portion of the drug proceeds, known as a "tax," to his or her respective MS-13 shot caller for the areas in which narcotics were trafficked.

7.   Defendants HURTADO, GRIJALVA, BARRIENTOS, SARAVIA, VALLADARES, LINARES, OLIVAR-MARTINEZ, TORRES-MIRANDA, ARRONIZ, GOMEZ-MEJIA, MARTIR, GONZALEZ, REYES, ARREDONDO, MENDOZA, GODINEZ-CAMPOS,

1  TORRES, JACO-VILLALOBOS, CHAVEZ, HERNANDEZ, ABARCA, and CHINCHILLA,
2  and others known and unknown to the Grand Jury, would possess with
3  intent to distribute, distribute, and facilitate the distribution of
4  narcotics in the territories controlled by MS-13.

5        8.   The MS-13 Inmate would designate certain MS-13 members like
6  defendant AQUINO-MARTINEZ to act as the treasurer for MS-13 Los
7  Angeles.  As treasurer, defendant AQUINO-MARTINEZ coordinated the
8  collection of the drug proceeds and "taxes" from each MS-13 Los
9  Angeles clique and was responsible for forwarding those profits and
10 taxes to the MS-13 Inmate.

11 C.   OVERT ACTS

12       On or about the following dates, in furtherance of the
13 conspiracy, and to accomplish the objects of the conspiracy,
14 defendants, and others known and unknown to the Grand Jury, committed
15 various overt acts, within the Central District of California, and
16 elsewhere, including, but not limited to, the following:

17       Overt Act No. 1:   On July 5, 2021, by telephone and text
18 message using coded language, the MS-13 Inmate agreed to sell a
19 confidential informant working at the direction of law enforcement
20 ("CI-1") two pounds of methamphetamine for $3,000 and told CI-1 to
21 obtain the methamphetamine from a co-conspirator and to deliver
22 payment for the methamphetamine to defendant CHINCHILLA.

23       Overt Act No. 2:   On July 6, 2021, by telephone using coded
24 language, the MS-13 Inmate told CI-1 that defendant CHINCHILLA was
25 prepared to accept money on behalf of the MS-13 inmate for the sale
26 of methamphetamine.

27       Overt Act No. 3:   On July 7, 2021, defendant CHINCHILLA
28 accepted $3,000 from CI-1 as payment for CI-1's purchase of

approximately 786 grams of methamphetamine in a deal arranged by the MS-13 Inmate.

Overt Act No. 4:   On July 28, 2021, by telephone and text message using coded language, defendant CHINCHILLA agreed to accept payment on behalf of the MS-13 Inmate for the sale of methamphetamine.

Overt Act No. 5:   On July 28, 2021, defendant CHINCHILLA accepted $3,000 from CI-1 as payment for CI-1's purchase of approximately 863 grams of methamphetamine from a co-conspirator in a deal arranged by the MS-13 Inmate.

Overt Act No. 6:   On December 8, 2021, by telephone using coded language, defendant SARAVIA told CI-1 that he was prepared to sell two pounds of methamphetamine to CI-1 on behalf of the MS-13 Inmate.

Overt Act No. 7:   On December 8, 2021, defendant SARAVIA sold approximately 877 grams of methamphetamine to CI-1 for $3,000.

Overt Act No. 8:   On January 2, 2022, by text message using coded language, defendant HURTADO agreed to contact the MS-13 Inmate on behalf of CI-1 so CI-1 could discuss additional drug purchases with the MS-13 Inmate.

Overt Act No. 9:   On January 3, 2022, by telephone using coded language, defendant REYES told CI-1 that he was prepared to sell three pounds of methamphetamine to CI-1 on behalf of the MS-13 Inmate.

Overt Act No. 10:   On January 5, 2022, by telephone using coded language, defendant REYES agreed to meet CI-1 at a restaurant in Los Angeles to finalize the sale of three pounds of methamphetamine to CI-1.

1    Overt Act No. 11:   On January 6, 2022, defendant SARAVIA sold
2    approximately 1.31 kilograms of methamphetamine to CI-1 for $4,500.
3    Overt Act No. 12:   On February 23, 2022, by voice message using
4    coded language, defendant HURTADO agreed to contact the MS-13 Inmate
5    on behalf of CI-1 so CI-1 could discuss additional drug purchases
6    with the MS-13 Inmate.
7    Overt Act No. 13:   On February 23, 2022, by telephone using
8    coded language, the MS-13 Inmate agreed to sell two pounds of
9    methamphetamine to CI-1 and told CI-1 to obtain the methamphetamine
10   from defendant REYES the following day.
11   Overt Act No. 14:   On February 24, 2022, by telephone using
12   coded language, defendant REYES told CI-1 that defendant SARAVIA was
13   prepared to sell the methamphetamine the MS-13 Inmate had agreed to
14   sell to CI-1 the previous day.
15   Overt Act No. 15:   On February 24, 2022, defendant SARAVIA sold
16   approximately 886 grams of methamphetamine to CI-1 for $3,000.
17   Overt Act No. 16:   On March 23, 2022, defendant HURTADO sent
18   CI-1 a text message containing a phone number so CI-1 could send
19   defendant HURTADO payment for the February 24, 2022, drug deal via
20   Zelle.
21   Overt Act No. 17:   On March 23, 2022, defendant HURTADO sent
22   CI-1 a text message acknowledging receipt of the money CI-1 sent
23   defendant HURTADO via Zelle as payment for the February 24, 2022,
24   drug deal.
25   Overt Act No. 18:   On April 6, 2022, by text message using
26   coded language, defendant SARAVIA told CI-1 he was prepared to sell
27   methamphetamine to CI-1 on behalf of the MS-13 Inmate.
28

13

1    Overt Act No. 19:   On April 6, 2022, defendant SARAVIA sold
2    approximately 869 grams of methamphetamine to CI-1 for $2,600.

3    Overt Act No. 20:   On May 11, 2022, by text message using coded
4    language, defendant HURTADO agreed to contact the MS-13 Inmate on
5    behalf of CI-1 and inform the MS-13 Inmate that CI-1 wanted to buy
6    two pounds of methamphetamine.

7    Overt Act No. 21:   On May 11, 2022, by voice message using
8    coded language, defendant HURTADO informed CI-1 that the MS-13 Inmate
9    had two pounds of methamphetamine available for sale and CI-1 should
10   contact defendant BARRIENTOS to finalize the purchase of the
11   methamphetamine.

12   Overt Act No. 22:   On May 17, 2022, by voice message and text
13   message using coded language, defendant HURTADO informed CI-1 that
14   defendant BARRIENTOS was prepared to sell two pounds of
15   methamphetamine to CI-1 and provided CI-1 with defendant BARRIENTOS's
16   phone number.

17   Overt Act No. 23:   On May 17, 2022, by text message using coded
18   language, defendant HURTADO informed CI-1 that the MS-13 Inmate had
19   agreed to sell two pounds of methamphetamine to CI-1 for $1,300 per
20   pound.

21   Overt Act No. 24:   On May 18, 2022, by telephone using coded
22   language, defendant BARRIENTOS told CI-1 that the MS-13 Inmate
23   instructed defendant BARRIENTOS to sell methamphetamine to CI-1 at
24   $1,200 per pound and that defendant BARRIENTOS was ready to sell
25   methamphetamine to CI-1.

26   Overt Act No. 25:   On May 18, 2022, defendant BARRIENTOS sold
27   approximately 870.8 grams of methamphetamine to CI-1 for $2,400.

28

14

1    Overt Act No. 26:   On May 18, 2022, by telephone using coded
2    language, defendant HURTADO told CI-1 that he had several ounces of
3    methamphetamine for sale and asked CI-1 to buy some of those ounces.

4    Overt Act No. 27:   On June 8, 2022, by telephone using coded
5    language, defendant HURTADO agreed to sell four ounces of
6    methamphetamine to CI-1.

7    Overt Act No. 28:   On June 8, 2022, by text message using coded
8    language, defendant GRIJALVA sent CI-1 two addresses where defendant
9    GRIJALVA said he could meet CI-1 to sell the methamphetamine
10   defendant HURTADO promised to CI-1.

11   Overt Act No. 29:   On June 9, 2022, defendant GRIJALVA sold
12   approximately 109.4 grams of methamphetamine to CI-1 for $500.

13   Overt Act No. 30:   On June 15, 2022, defendant TORRES-MIRANDA
14   sold approximately 69.5 grams of methamphetamine and a shotgun to a
15   different confidential informant working at the direction of law
16   enforcement ("CI-2") for $1,100.

17   Overt Act No. 31:   On June 18, 2022, by text message using
18   coded language, defendant HURTADO agreed to sell three ounces of
19   methamphetamine to CI-1 for $300.

20   Overt Act No. 32:   On June 22, 2022, defendant TORRES-MIRANDA
21   sold approximately 53.7 grams of methamphetamine to CI-2 for $400.

22   Overt Act No. 33:   On June 28, 2022, by text message using
23   coded language, defendant SARAVIA told CI-1 that he was prepared to
24   sell methamphetamine to CI-1 the following day.

25   Overt Act No. 34:   On June 29, 2022, defendant SARAVIA sold
26   approximately 870.8 grams of methamphetamine to CI-1 for $2,000.

27   Overt Act No. 35:   On June 29, 2022, defendant GONZALEZ sold
28   approximately 81.9 grams of methamphetamine to CI-1 for $300.

Overt Act No. 36:   On July 9, 2022, by text message using coded language, defendant HURTADO told CI-1 that he had methamphetamine available for purchase.

Overt Act No. 37:   On July 13, 2022, by telephone and text message using coded language, defendant GRIJALVA agreed to sell three ounces of methamphetamine to CI-1 for $300.

Overt Act No. 38:   On July 19, 2022, by telephone using coded language, defendant LINARES agreed to sell two ounces of methamphetamine to CI-1 for $300.

Overt Act No. 39:   On July 20, 2022, defendants LINARES and ARREDONDO sold approximately 53.9 grams of methamphetamine to CI-1 for $300.

Overt Act No. 40:   On July 20, 2022, defendant GRIJALVA sold approximately 81.8 grams of methamphetamine to CI-1 for $300.

Overt Act No. 41:   On August 15, 2022, by telephone and text message using coded language, defendant HURTADO agreed to sell three ounces of methamphetamine to CI-1 for $300 in a deal that would be completed with defendant GRIJALVA.

Overt Act No. 42:   On August 17, 2022, by telephone using coded language, defendant BARRIENTOS told CI-1 that he was prepared to sell two pounds of methamphetamine to CI-1 for $2,000.

Overt Act No. 43:   On August 17, 2022, defendants GRIJALVA and TORRES sold approximately 81 grams of methamphetamine to CI-1 for $300.

Overt Act No. 44:   On August 17, 2022, defendant BARRIENTOS sold approximately 866 grams of methamphetamine to CI-1 for $2,000.

Overt Act No. 45:   On August 24, 2022, by telephone using coded language, defendant OLIVAR-MARTINEZ agreed to sell four ounces of methamphetamine to CI-2 for $800.

Overt Act No. 46:   On August 24, 2022, defendant OLIVAR-MARTINEZ sold approximately 99.6 grams of methamphetamine to CI-2 for $800.

Overt Act No. 47:   On August 29, 2022, by text message using coded language, defendant AQUINO-MARTINEZ requested that defendant ARRONIZ pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by defendant ARRONIZ's clique for the previous month.

Overt Act No. 48:   On September 7, 2022, by telephone using coded language, defendant OLIVAR-MARTINEZ agreed to sell four ounces of methamphetamine to CI-2 for $800.

Overt Act No. 49:   On September 8, 2022, defendant OLIVAR-MARTINEZ sold approximately 99.7 grams of methamphetamine to CI-2 for $800.

Overt Act No. 50:   On September 20, 2022, by telephone and text message using coded language, defendant LINARES agreed to sell four ounces of methamphetamine to CI-1 for $400.

Overt Act No. 51:   On September 21, 2022, defendant LINARES sold approximately 109.2 grams of methamphetamine to CI-1 for $400.

Overt Act No. 52:   On October 3, 2022, by telephone using coded language, defendant BARRIENTOS agreed to sell a pound of methamphetamine to CI-1.

Overt Act No. 53:   On October 4, 2022, by telephone using coded language, defendant BARRIENTOS told CI-1 that the price for a pound of methamphetamine was $1,000.

1     <u>Overt Act No. 54:</u>  On October 5, 2022, defendant BARRIENTOS

2 sold approximately 430 grams of methamphetamine to CI-1 for $1,000.

3     <u>Overt Act No. 55:</u>  On October 29, 2022, by text message using

4 coded language, defendant AQUINO-MARTINEZ requested that defendant

5 ARRONIZ pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by

6 defendant ARRONIZ's clique for the previous month.

7     <u>Overt Act No. 56:</u>  On November 20, 2022, by telephone using

8 coded language, defendant VALLADARES agreed to sell three ounces of

9 methamphetamine to CI-1 in two deals, one with defendant GODINEZ-

10 CAMPOS and a second one with defendant VALLADARES.

11     <u>Overt Act No. 57:</u>  On November 21, 2022, defendant GODINEZ-

12 CAMPOS sold approximately 53.2 grams of methamphetamine to CI-1 for

13 $250.

14     <u>Overt Act No. 58:</u>  On November 21, 2022, defendant VALLADARES

15 sold approximately 27.2 grams of methamphetamine to CI-1 for $125.

16     <u>Overt Act No. 59:</u>  On November 28, 2022, by text message using

17 coded language, defendant AQUINO-MARTINEZ requested that defendant

18 ARRONIZ pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by

19 defendant ARRONIZ's clique for the previous month.

20     <u>Overt Act No. 60:</u>  On December 5, 2022, by text message using

21 coded language, defendant ARREDONDO agreed to sell three ounces of

22 methamphetamine to CI-1.

23     <u>Overt Act No. 61:</u>  On December 7, 2022, defendant ARREDONDO

24 sold approximately 82.2 grams of methamphetamine to CI-1 for $420.

25     <u>Overt Act No. 62:</u>  On December 7, 2022, by telephone and text

26 message using coded language, defendant BARRIENTOS agreed to sell one

27 pound of methamphetamine to CI-1 for $800.

28

<u>Overt Act No. 63:</u>   On December 7, 2022, defendant BARRIENTOS sold approximately 430 grams of methamphetamine to CI-1 for $800.

<u>Overt Act No. 64:</u>   On December 19, 2022, by telephone using coded language, defendant ARRONIZ agreed to sell four ounces of methamphetamine to CI-2 for $800.

<u>Overt Act No. 65:</u>   On December 20, 2022, defendant ARRONIZ sold approximately 106.7 grams of methamphetamine to CI-2 for $800.

<u>Overt Act No. 66:</u>   On December 30, 2022, by text message using coded language, defendant AQUINO-MARTINEZ requested that defendant ARRONIZ pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by defendant ARRONIZ's clique for the previous month.

<u>Overt Act No. 67:</u>   On January 12, 2023, by telephone using coded language, defendant BARRIENTOS agreed to sell one pound of methamphetamine to CI-1 for $800.

<u>Overt Act No. 68:</u>   On January 12, 2023, defendant BARRIENTOS sold approximately 437 grams of methamphetamine to CI-1 for $800.

<u>Overt Act No. 69:</u>   On January 20, 2023, by text message using coded language, defendant AQUINO-MARTINEZ requested that defendant ARRONIZ pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by defendant ARRONIZ's clique for the previous month.

<u>Overt Act No. 70:</u>   On January 24, 2023, defendant ARRONIZ sold approximately 110.7 grams of methamphetamine to CI-2 for $800.

<u>Overt Act No. 71:</u>   On February 9, 2023, by telephone using coded language, defendant ABARCA told CI-1 that he contacted defendant GRIJALVA on CI-1's behalf and told defendant GRIJALVA that CI-1 wanted to buy three ounces of methamphetamine.

Overt Act No. 72:   On February 12, 2023, by telephone using coded language, defendant GRIJALVA agreed to sell three ounces of methamphetamine to CI-1 for $330.

Overt Act No. 73:   On February 13, 2023, in a telephone call using coded language, defendant ABARCA agreed to accept $30 from CI-1 as payment for coordinating defendant GRIJALVA's sale of methamphetamine to CI-1.

Overt Act No. 74:   On February 13, 2023, defendant GRIJALVA sold approximately 82.6 grams of methamphetamine to CI-1 for $330.

Overt Act No. 75:   On February 26, 2023, by telephone using coded language, defendant MENDOZA agreed to sell three ounces of methamphetamine to CI-1 for $450.

Overt Act No. 76:   On February 27 and 28, 2023, by telephone using coded language, defendant VALLADARES agreed to sell three ounces of methamphetamine to CI-1.

Overt Act No. 77:   On February 28, 2023, by telephone using coded language, defendant VALLADARES confirmed to CI-1 that the price for three ounces of methamphetamine was $390.

Overt Act No. 78:   On February 28, 2023, defendant VALLADARES sold approximately 84.5 grams of methamphetamine to CI-1 for $390.

Overt Act No. 79:   On February 28, 2023, defendant MENDOZA sold approximately 82.8 grams of methamphetamine to CI-1 for $450.

Overt Act No. 80:   On March 18, 2023, by telephone using coded language, defendant MENDOZA agreed to sell four ounces of methamphetamine to CI-1.

Overt Act No. 81:   On March 20, 2023, by telephone using coded language, defendant BARRIENTOS agreed to sell two pounds of methamphetamine to CI-1.

Overt Act No. 82:   On March 21, 2023, defendant BARRIENTOS sold approximately 882.2 grams of methamphetamine to CI-1 for $1,000.

Overt Act No. 83:   On March 21, 2023, by telephone using coded language, defendant MENDOZA told CI-1 that the price for four ounces of methamphetamine would be $600.

Overt Act No. 84:   On March 21, 2023, defendant CHAVEZ sold approximately 108.8 grams of methamphetamine to CI-1 for $460.

Overt Act No. 85:   On March 27 and March 28, 2023, by text message using coded language, defendant BARRIENTOS instructed CI-1 to send the remainder of the money for the 882.2 grams of methamphetamine to defendant AQUINO-MARTINEZ.

Overt Act No. 86:   On March 28, 2023, by telephone using code language, defendant AQUINO-MARTINEZ told CI-1 that defendant BARRIENTOS designated defendant AQUINO-MARTINEZ as the recipient of the outstanding amount of money owed by CI-1 to defendant BARRIENTOS for the March 21, 2023, methamphetamine deal.

Overt Act No. 87:   On March 28, 2023, by text message using coded language, defendant AQUINO-MARTINEZ provided CI-1 with a telephone number that CI-1 could use to provide defendant AQUINO-MARTINEZ money via Internet cash transfer application.

Overt Act No. 88:   On April 29, 2023, by telephone using coded language, defendant JACO-VILLALOBOS agreed to sell three ounces of methamphetamine to CI-1.

Overt Act No. 89:   On May 1, 2023, defendant MARTIR agreed to sell three ounces of methamphetamine to CI-1 for $375.

Overt Act No. 90:   On May 2, 2023, defendants GODINEZ-CAMPOS and MARTIR sold approximately 145.4 grams of methamphetamine to CI-1.

<u>Overt Act No. 91:</u>   On July 11, 2023, by telephone using coded language, defendant GOMEZ-MEJIA agreed to sell four ounces of methamphetamine to CI-1.

<u>Overt Act No. 92:</u>   On July 12, 2023, defendant GOMEZ-MEJIA sold approximately 110.4 grams of methamphetamine to CI-1 for $560.

<u>Overt Act No. 93:</u>   On July 31, 2023, by telephone using coded language, defendant HERNANDEZ agreed to sell two ounces of methamphetamine to CI-1 for $260.

<u>Overt Act No. 94:</u>   On August 1, 2023, defendant HERNANDEZ sold approximately 55.53 grams of methamphetamine to CI-1 for $260.

COUNT TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT CHINCHILLA]

On or about July 7, 2021, in Los Angeles County, within the Central District of California, defendant BYRON CHINCHILLA, also known as "Psycho," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 786 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT CHINCHILLA]

On or about July 28, 2021, in Los Angeles County, within the Central District of California, defendant BYRON CHINCHILLA, also known as "Psycho," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 863 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SARAVIA]

On or about December 8, 2021, in Los Angeles County, within the Central District of California, defendant CESAR SARAVIA, also known as ("aka") "Sleepy," aka "Washington," knowingly and intentionally distributed at least 50 grams, that is, approximately 877 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS SARAVIA and REYES]

On or about January 6, 2022, in Los Angeles County, within the Central District of California, defendants CESAR SARAVIA, also known as ("aka") "Sleepy," aka "Washington," and JOSE REYES, aka "Husky," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 1.31 kilograms, of methamphetamine, a Schedule II controlled substance.

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS SARAVIA and REYES]

On or about February 24, 2022, in Los Angeles County, within the Central District of California, defendants CESAR SARAVIA, also known as ("aka") "Sleepy," aka "Washington," and JOSE REYES, aka "Husky," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 886 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SARAVIA]

On or about April 6, 2022, in Los Angeles County, within the Central District of California, defendant CESAR SARAVIA, also known as "Sleepy," aka "Washington," knowingly and intentionally distributed at least 50 grams, that is, approximately 869 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS HURTADO and BARRIENTOS]

On or about May 18, 2022, in Los Angeles County, within the Central District of California, defendants PAVEL HURTADO, also known as ("aka") "Temper," and HERLYN BARRIENTOS, aka "Doctorazo," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 870.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS HURTADO and GRIJALVA]

On or about June 9, 2022, in Los Angeles County, within the Central District of California, defendants PAVEL HURTADO, also known as ("aka") "Temper," and ELI GRIJALVA, aka "Skinny," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 109.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT TORRES-MIRANDA]

On or about June 15, 2022, in Los Angeles County, within the Central District of California, defendant CARLOS TORRES-MIRANDA, also known as "Estricto," aka "Malaspecto," knowingly and intentionally distributed at least 50 grams, that is, approximately 69.5 grams, of methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT TORRES-MIRANDA]

On or about June 22, 2022, in Los Angeles County, within the Central District of California, defendant CARLOS TORRES-MIRANDA, also known as "Estricto," aka "Malaspecto," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SARAVIA]

On or about June 29, 2022, in Los Angeles County, within the Central District of California, defendant CESAR SARAVIA, also known as "Sleepy," aka "Washington," knowingly and intentionally distributed at least 50 grams, that is, approximately 870.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS HURTADO, GRIJALVA, and GONZALEZ]

On or about June 29, 2022, in Los Angeles County, within the Central District of California, defendants PAVEL HURTADO, also known as ("aka") "Temper," ELI GRIJALVA, aka "Skinny," and AMILCAR GONZALEZ, aka "Lunatico," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS LINARES and ARREDONDO]

On or about July 20, 2022, in Los Angeles County, within the Central District of California, defendants ELMER LINARES, also known as ("aka") "Macabro, and JOSE ARREDONDO, aka "Misterio," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 53.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS HURTADO and GRIJALVA]

On or about July 20, 2022, in Los Angeles County, within the Central District of California, defendants PAVEL HURTADO, also known as ("aka") "Temper," and ELI GRIJALVA, aka "Skinny," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS HURTADO, GRIJALVA, and TORRES]

On or about August 17, 2022, in Los Angeles County, within the Central District of California, defendants PAVEL HURTADO, also known as ("aka") "Temper," ELI GRIJALVA, aka "Skinny," and DOUGLAS TORRES, aka "Midnight," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT BARRIENTOS]

On or about August 17, 2022, in Los Angeles County, within the Central District of California, defendant HERLYN BARRIENTOS, also known as "Doctorazo" knowingly and intentionally distributed at least 50 grams, that is, approximately 866 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT OLIVAR-MARTINEZ]

On or about August 24, 2022, in Los Angeles County, within the Central District of California, defendant ORLANDO OLIVAR-MARTINEZ, also known as "Tacuba," knowingly and intentionally distributed at least 50 grams, that is, approximately 99.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT OLIVAR-MARTINEZ]

On or about September 8, 2022, in Los Angeles County, within the Central District of California, defendant ORLANDO OLIVAR-MARTINEZ, also known as "Tacuba," knowingly and intentionally distributed at least 50 grams, that is, approximately 99.7 grams, of methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

8

COUNT TWENTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT LINARES]

On or about September 21, 2022, in Los Angeles County, within the Central District of California, defendant ELMER LINARES, also known as "Macabro," knowingly and intentionally distributed at least 50 grams, that is, approximately 109.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT BARRIENTOS]

On or about October 5, 2022, in Los Angeles County, within the Central District of California, defendant HERLYN BARRIENTOS, also known as "Doctorazo," knowingly and intentionally distributed at least 50 grams, that is, approximately 430 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS VALLADARES and GODINEZ-CAMPOS]

On or about November 21, 2022, in Los Angeles County, within the Central District of California, defendants PEDRO VALLADARES, also known as ("aka") "Psycho," and CLIDER GODINEZ-CAMPOS, aka "Jicli," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 80.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ARREDONDO]

On or about December 7, 2022, in Los Angeles County, within the Central District of California, defendant JOSE ARREDONDO, also known as "Misterio," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT BARRIENTOS]

On or about December 7, 2022, in Los Angeles County, within the Central District of California, defendant HERLYN BARRIENTOS, also known as "Doctorazo," knowingly and intentionally distributed at least 50 grams, that is, approximately 430 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ARRONIZ]

On or about December 20, 2022, in Los Angeles County, within the Central District of California, defendant JUAN ARRONIZ, also known as "Tiny," knowingly and intentionally distributed at least 50 grams, that is, approximately 106.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT BARRIENTOS]

On or about January 12, 2023, in Los Angeles County, within the Central District of California, defendant HERLYN BARRIENTOS, also known as "Doctorazo," knowingly and intentionally distributed at least 50 grams, that is, approximately 437 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ARRONIZ]

On or about January 24, 2023, in Los Angeles County, within the Central District of California, defendant JUAN ARRONIZ, also known as "Tiny," knowingly and intentionally distributed at least 50 grams, that is, approximately 110.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS ABARCA and GRIJALVA]

On or about February 13, 2023, in Los Angeles County, within the Central District of California, defendants RIQUELMY ABARCA, also known as ("aka") "Bago," and ELI GRIJALVA, aka "Skinny," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 82.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT VALLADARES]

On or about February 28, 2023, in Los Angeles County, within the Central District of California, defendant PEDRO VALLADARES, also known as "Psycho," knowingly and intentionally distributed at least 50 grams, that is, approximately 84.5 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT MENDOZA]

On or about February 28, 2023, in Los Angeles County, within the Central District of California, defendant ANDERSON MENDOZA, also known as "Cypher," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT BARRIENTOS]

On or about March 21, 2023, in Los Angeles County, within the Central District of California, defendant HERLYN BARRIENTOS, also known as "Doctorazo," knowingly and intentionally distributed at least 50 grams, that is, approximately 882.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANTS MENDOZA and CHAVEZ]

On or about March 21, 2023, in Los Angeles County, within the Central District of California, defendants ANDERSON MENDOZA, also known as ("aka") "Cypher," and MARIA CHAVEZ, aka "Moana," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 108.8 grams, of methamphetamine, a Schedule II controlled substance.

1

COUNT THIRTY-THREE

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

3

[DEFENDANTS JACO-VILLALOBOS, GODINEZ-CAMPOS, and MARTIR]

4

On or about May 2, 2023, in Los Angeles County, within the

5

Central District of California, defendants CARLOS JACO-VILLALOBOS,

6

also known as ("aka") "Clavo," CLIDER GODINEZ-CAMPOS, aka "Jicli,"

7

and MARTIR, aka "Insolente," each aiding and abetting the other,

8

knowingly and intentionally distributed at least 50 grams, that is,

9

approximately 145.4 grams, of methamphetamine, a Schedule II

10

controlled substance.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

COUNT THIRTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT GOMEZ-MEJIA]

On or about July 12, 2023, in Los Angeles County, within the Central District of California, defendant EDER GOMEZ-MEJIA, also known as ("aka") "Huero," knowingly and intentionally distributed at least 50 grams, that is, approximately 110.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT HERNANDEZ]

On or about August 1, 2023, in Los Angeles County, within the Central District of California, defendant MARCO HERNANDEZ, also known as ("aka") "Clandestino," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.53 grams, of methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THIRTY-SIX

[18 U.S.C. § 922(g)(1)]

[DEFENDANT TORRES]

On or about October 25, 2021, in Los Angeles County, within the Central District of California, defendant DOUGLAS TORRES, also known as "Midnight," knowingly possessed ammunition, namely, four rounds of Prvi Partizan 9mm ammunition, two rounds of Blazer 9mm ammunition, one round of Fiocchi 9mm ammunition, one round of Speer 9mm ammunition, one round of Remington 9mm ammunition, one round of Aguila 9mm ammunition, and one round of Federal Cartridge Company 9mm ammunition, loaded inside a 9mm handgun of unknown manufacture, bearing no make, model, or serial number (also known as a "ghost gun"), in and affecting interstate and foreign commerce.

Defendant TORRES possessed such ammunition knowing that he had been previously convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Theft and Unlawful Driving or Taking of a Vehicle, in violation of California Vehicle Code Section 10851(a), in the Superior Court of the State of California, County of Los Angeles, case number BA490536, on or about July 16, 2021.

1              FORFEITURE ALLEGATION ONE

2         [21 U.S.C. § 853; 28 U.S.C. § 2461(c)]

3      1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 21,

6  United States Code, Section 853 and Title 28, United States Code,

7  Section 2461(c), in the event of any defendant's conviction of the

8  offenses set forth in Counts One through Thirty-Five of this

9  Indictment.

10     2.    Any defendant so convicted shall forfeit to the United

11 States of America the following:

12         (a)   All right, title and interest in any and all property,

13 real or personal, constituting or derived from, any proceeds which

14 the defendant obtained, directly or indirectly, from any such

15 offense;

16         (b)   All right, title and interest in any and all property,

17 real or personal, used, or intended to be used, in any manner or

18 part, to commit, or to facilitate the commission of any such offense;

19         (c)   To the extent such property is not available for

20 forfeiture, a sum of money equal to the total value of the property

21 described in subparagraphs (a) and (b).

22     3.    Pursuant to Title 21, United States Code, Section 853(p),

23 any defendant so convicted shall forfeit substitute property if, by

24 any act or omission of said defendant, the property described in the

25 preceding paragraph, or any portion thereof: (a) cannot be located

26 upon the exercise of due diligence; (b) has been transferred, sold

27 to, or deposited with a third party; (c) has been placed beyond the

28 jurisdiction of the court; (d) has been substantially diminished in

value; or (e) has been commingled with other property that cannot be divided without difficulty.

1

FORFEITURE ALLEGATION TWO

2

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

3      1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 18,

6  United States Code, Section 981(a)(1)(C), and Title 28, United States

7  Code, Section 2461(c), in the event of any defendant's conviction of

8  the offenses set forth in any of Counts Thirty-Six through Thirty-

9  Eight of this Indictment.

10      2.   Any defendant so convicted shall forfeit to the United

11  States of America the following:

12           a.   all right, title, and interest in any and all

13  property, real or personal, constituting, or derived from, any

14  proceeds traceable to any of the offenses; and

15           b.   To the extent such property is not available for

16  forfeiture, a sum of money equal to the total value of the property

17  described in subparagraph (a).

18      3.   Pursuant to Title 21, United States Code, Section 853(p),

19  as incorporated by Title 28, United States Code, Section 2461(c), the

20  convicted defendant shall forfeit substitute property, up to the

21  value of the property described in the preceding paragraph if, as the

22  result of any act or omission of said defendant, the property

23  described in the preceding paragraph or any portion thereof (a)

24  cannot be located upon the exercise of due diligence; (b) has been

25  transferred, sold to, or deposited with a third party; (c) has been

26  placed beyond the jurisdiction of the court; (d) has been

27  ///

28

1  substantially diminished in value; or (e) has been commingled with

2  other property that cannot be divided without difficulty.

3

4

5                                        A TRUE BILL

6

7                                             /s/

   _____

8                                        Foreperson

9  E. MARTIN ESTRADA
   United States Attorney

10

11

12 MACK E. JENKINS
   Assistant United States Attorney

13 Chief, Criminal Division

14 JOSHUA O. MAUSNER
   Assistant United States Attorney

15 Chief, Violent & Organized Crime
   Section

16

17 SHAWN T. ANDREWS
   Assistant United States Attorney

18 Terrorism and Export Crimes
   Section

19 HAVA MIRELL
   Assistant United States Attorney

20 Violent & Organized Crime Section

21

22

23

24

25

26

27

28